Good morning, and may it please the Court. Olivia Sly was already having one of the worst nights of her life before she was ravaged by an attack dog for no discernible reason at the hands of the law enforcement officers ostensibly there to protect her and help her. They knew that she was unarmed, had not committed a crime, and was not a threat. So Ms. Sly is merely asking that this Court allow her case against these officers and these agencies to continue into discovery. Did she resist arrest? That is a question up for debate, Your Honor. Appellant would argue that she offered passive resistance at most, and that even if that is the case, that it would not outweigh the other factors at issue in the excessive force analysis. And based on the video evidence already available, a reasonable jury could easily find that, among other things, Officer Sutton did not give an adequate canine warning, that Deputy Montes had ample opportunity to do something to intervene but chose to do nothing, that the factors such as the speed of the escalation and the lack of need for force or handcuffs, let alone near-deadly force, make compensable excessive force claims that overcome the officer's qualified immunity. And with that in mind, Appellant has three main points on appeal. The first is that because the excessive force factors weigh so heavily in Appellant's favor, against the use of near-deadly force in this case where the officers were on a mental health call and no law enforcement or other apparent purpose was served by the use of the dog bite, Appellant's civil rights claims against the officers must survive. The second point is that based on the facts and the video evidence, no exigent circumstances exist to absolve either the city or the county of liability under Title II of the ADA or the Rehabilitation Act, because the only immediate threat to mislie was presented by the officers and the dog. And third, any and all of the Monell claims against the city of Conroe, all independently and collectively, those being the city's written policies, the lack of appropriateness and ethics training, and the ratification claim are more than plausible and must also survive. So I'll turn first to that first point, which is excessive force, and just expound upon the fact that no law enforcement or other discernible purpose was served by the dog bite. The dog bite did not address any threat presented by mislie, let alone an immediate one, which is required by this Court's opinion in Cooper v. Brown. I view this in two stages, and we look at each stage independently to see if there was excessive force. And the first would be the initial siccing the dog on your client. And then the other one would be the inability to get the dog off of her when she was subdued. Correct. So those are two different stages, and you're making a claim on each part of it? Yes. What is your best case for the first part, that it was wrong to sic the dog on her, for lack of a better term, initially? I understand that going on and on after she's subdued, there is some case law that might be clearly established that that would be inappropriate. Right. So the best case for that, Your Honor, is still Cooper v. Brown. Of course, the site for that is 844 F. 3rd 517. Basically the concept there is what that case clearly establishes is that unless there is an immediate threat that needs to be addressed by the use of a canine, which is just below deadly force, and I don't think in this case it could even be argued that deadly force was justified in any sense. I mean, of course, that's not the issue, but we're only talking about a step down here. So we're using the Graham factors each time. Correct. Is there a case that would say, clearly established law would say, that where it's a mental health person and not an arrestee fleeing, that it would be inappropriate to use the dog? There is not a case that addresses a mental health call specifically, but the fact that the cases address crimes that were committed, Cooper v. Brown as an example, was a DUI case, and in that case, the court, this court basically had said that a DUI was not a violent crime, and therefore the suspect in that case should not have been treated as violent or posing a threat or dangerous. In this case, it's clearly more favorable to our plaintiff here, where— Cooper v. Brown is your clearly established law on both of your claims? Yes. Yes. Because it addresses both the initial use of force and the ongoing use of force. The issue there was not only that the dog bite extended for an extended period of time as it did here, but that it wasn't justified in the first place, which is exactly the argument that we're making here. Because the dog bite, again, so it didn't serve the law enforcement purpose, it didn't get her to the medical care that they were ostensibly there to get her to any more safely or any more effectively, and it didn't prevent any attempted escape because no escape was attempted. In this case, it also presents several facts that would fall outside the normal factors that are usually considered for excessive force. So we have facts like the lack of a canine warning that she'd given herself up, and that the attempt to handcuff her in the first place is questionable at best. So going through those three things, there was a lot made at the district court level about whether or not there was an adequate warning given. The only thing that the district court or my friends at the other table can point to are Officer Sutton's statement to do not walk toward me or the dog will bite you. That was 30 seconds before the dog was released, and the action precipitating the release of the dog had nothing to do with Ms. Sly walking toward Officer Sutton. It was evidently in this review of the case post hoc and arguments made by attorneys, it was evidently the nine-second attempt by, a failed nine-second attempt by Deputy Montes to attempt to handcuff her, which again, that's kind of another factor that falls outside the normal excessive force analysis, which is that this is a case where there was again no crime committed. So the need to handcuff her is questionable at best. She had already given herself up. They had already, by Montes's own report, had her cornered on a fence in the woods. And while she was verbally engaging with them, and they hadn't attempted to lead her away and hadn't attempted to see if she would follow them, she had certainly stopped giving chase. She had not initiated any contact or any level of resistance and wasn't trying to escape at any point. So as far as the officers were aware in the situation in front of them, there was no reason to believe there was a need to handcuff Ms. Sly. And then we can look at the excessive force factors themselves. She, like the plaintiff in Cooper v. Brown, was not threatening. She didn't have a weapon. They could see her hands the entire time. She was wearing a tank top and running shorts. It was clear there was no weapon on her. She wasn't holding one. She wasn't wielding one. She wasn't hiding one. Are the dogs trained, like in the Oakland, California case from 1998, I think, where they were trained to continue to bite whatever's nearest them and to keep biting? Is that part of the training, and do we know that in this record? So appellant's understanding is that the training is in that vein, where it's find-and-bite focused. And keep biting the nearest part of the body that's nearest until the verbal command's given?  So that is appellant's understanding at this stage. Of course, the case hasn't entered discovery, so we don't have all of the specific, the nitty-gritty details of all the training that was gone through. But we do know that there were over 220 pages worth of records indicating that Officer Sutton and his dog Thor had undergone find-and-bite training. But, and this is where we can kind of turn to the Monell issue, where there is all of this find-and-bite training. But there's no training as to, at least that appellant has alleged or can find, any training on the appropriateness of using the dog as a weapon or ethics on using the dog as a weapon. Or how to handle the dog, who, as we're just discussing, is trained as a find-and-bite dog in a situation where the dog just needs to find the person, which is what the officer was presented with here. They needed to find Miss Sutton. But the dog, trained as a find-and-bite dog, naturally would want to bite her. So the officer, in theory, should have been trained on whether or not it was appropriate to release the dog in that instance and how to appropriately handle when the dog is overexuberant and wanting to bite now that it has found its target like it was trained to do. And since we're already talking about Monell, that dovetails nicely into a discussion about the policies that were at issue. The district court, rather confusingly, said that there was no policymaker identified or policies. But the city itself provided the written policies that were approved by the policymaker. So that issue isn't in dispute. It's about whether the policies in this case were adequate to survive the Monell challenge. And appellate, of course, asserts that they're not. The policies amount to basically don't use excessive force and then kind of a vague, non-exclusive, open-ended list of instances where the use of a find-and-bite dog is permissible but not really reining in anything with respect to the use or the limits. Is it permissible under the guidelines to use the dog for a mental health person who's not fleeing a crime? Well the policy... Is there an explicit language of the policy? So based on the explicit language of the policy, the policymakers that reviewed the incident certainly think that it was permitted under the policy. But the policy that you would say, number three, says where you were trying to keep someone from killing themselves or dealing with a mental health crisis, you can have the dog. It's appropriate to bite, to corral the person. Right. The policy at issue doesn't address mental health patients specifically. But what the policy does say, as alleged on ROA 723, is that a dog may be utilized to bite any suspect evading arrest or has a potential for violence. I mean those are kind of... But she wouldn't have been under arrest. Right. But the sort of post hoc justifications that we've talked about in this case over the course of the litigation all have to do with, well, maybe she could have escaped or maybe, you know, the other side in the district court seemed to think that she instigated some sort of fight with Montez, even though the video doesn't, by our viewing, show that in any way. Those are kind of the... Demonstrate that... Why would she agree to escape? Why... You know, that's what I don't understand from this. If she is suicidal, obviously, we would not wish anyone to kill themselves, but they don't... Isn't she free to not go with the officers? Does she have to go with the officers? She cusses at the officers, but does she have to... in that circumstance, such that she must go with them? Your Honor, that's not an issue that was raised directly, so I would hesitate to speak with any kind of great degree of certainty, especially with respect to any precedent on the issue. If this is an issue that needs further briefing, we'd be happy to do that, but based on my understanding, I don't believe that it would have been required. I... There may be, under Texas law, some sort of protective custody requirement, but again, that's not something I can confidently say is the case, but yeah, I don't believe in this instance, because she wasn't under arrest, she hadn't committed a crime, they knew that, I don't believe she was required to follow their instructions, but yeah, this is an issue that, again, could require more briefing if it becomes a major point of contention for this Court to consider. And with my final just over a minute here, I'd just like to briefly address the Title II and ADA claims. The only reason those were dismissed were because of the exigent circumstances exception, which the argument there, the justification there, by appellant's understanding of it, is inherently self-contradictory and nonsensical. The idea is that the danger that was created was the danger that Olivia faced from herself, which was due at most, and without conceding this, to continued bleeding. So it's unclear how allowing officers to address that quote-unquote exigent threat with inflicting further injuries that cause more bleeding and from a dog have a much greater risk of a permissible way of addressing that so-called exigent threat. And there's no argument that appellant can find that she was a threat to the officers. So the only threat to anybody in this situation were the threat of the officers to Olivia that was, of course, realized by their use of the attack dog in this situation. So absent any further questions from the Court, appellant would ask that this Court reverse and remand for further proceedings and continuation into discovery. And I reserve my time for rebuttal. JUSTICE SCALIA. Yes. You've saved time for rebuttal. Thank you, Mr. Johnson. Mr. Selby. STEPHEN SELBY. Good morning. May it please the Court, Steve Selby for Tyson Sutton and the City of Conroe. And Judge Elrod, I wanted to address . . . because it was not included in the briefing and I'm going to tell you why it was not included in the briefing, I wanted to address your sort of seizure question. Did the officers in this case have a right, a duty, maybe is a better word, to seize the plaintiff? And we contended at the district court that they did. And so, therefore, we raised that they have a community caretaker function. And that briefing in the motion to dismiss is at 895 and 899 of the record. And there's been a variety of cases that have come out on it, including an old case from the Fifth Circuit called Rideau. It's been expanded in other circuits. But basically, police officers who are . . . encounter someone in a mental health situation. There's an Iowa case in which a person is in a vehicle and they're obviously having some type of episode. And the officers break the window and bring that person out, and in the course of bringing them out, they have to use some force to . . . I think there's a punch. They use some force to get that person out, get them secure, and get them to medical attention. And so with Rideau, United States v. King, the cases that we cited in our motion to dismiss, we believe there is absolutely a right, a duty, and an expectation for police officers to get these people secure, get them to medical attention. And the plaintiffs didn't challenge that. I think that's . . . As you know, I dissented in Rideau, but it is good circuit law, so it's proper . . . I also understand that we're here with probably the largest expert in canine law in the circuit opinions, Judge Smith, with you and Cooper v. Brown, and also the Montee case. So we use that. That's the basis for the police officers having the right to seize her, to get her under control and get her to medical care. And the plaintiffs never challenged it, and I think that that's probably why Judge Eskridge did not write about it. It wasn't challenged, and it hasn't been . . . it wasn't challenged there, it wasn't challenged here. But putting that to one side, is it your position that Thor just went out of control and that nobody could have expected that Thor was going to go out of control? And so, it's unfortunate that Thor did this, but it's not on any of his handlers or trainers or on the department. Is that your position? That is exactly right. But, Your Honor, let me get there first in terms of sort of the undisputed facts shown in the video, and then I'll talk about that if allowed. So in the video, I think it's undisputed that the first time that the officers encounter her . . . I'm sorry, the first time that Officer Sutton and his canine partner find her, she flees further into the woods. She hears him calling a Montgomery County Sheriff's officer to come help him, and she flees further into the woods. They find her again, Sutton and the canine, and if you've seen the video, you understand the woods and the brambles that we're dealing with. I mean, this is sort of the start of the East Texas Piney Woods, and it is thick and it is deep, but they find her again, and Sutton does not want to engage her. He does not want to engage her with the dog on the lead in front of him, and so he tells her. She starts to walk towards him, not giving herself up. Say that again. Pretty quick. She's walking, and he says, no, stop, I'm going to stick the dog, and then all of a sudden the dog is on her. It's not a . . . No, no, no, no, no. No, I watched the video. It's not very . . . Your Honor . . . There's not a long period of time between him counseling her about not walking that direction and then the dog being on her. I respectfully believe that there are a couple of things that happened before that. What are the relevant ones? Okay. He says twice, do not walk towards me, do not walk towards me, the dog will bite you. He also says three times, put your hands behind your back, put your hands behind your back, put your hands behind your back. She responds each time hostilely. To put it a nice way, she is responding to him hostilely. Deputy Montes gets there. Deputy Montes says twice, back up, back up. She doesn't do it. Deputy Montes also says, put your hands behind your back. She doesn't. That's when her and Montes engage in the . . . They don't want . . . The plaintiffs say that we called it fisticuffs in their briefing. I don't think it's fisticuffs. I think it's a wrestling match in the woods with a sweaty, bloody person, and it's very difficult for Officer Deputy Montes in that circumstance. Basically, in that first physical encounter, she wins. She comes out of that, and she is not under control, and she is not handcuffed in any way. We do . . . Do you understand? I mean, it's very hard to know what she understood then at any point, but that she had to comply with putting her hands behind her . . . Like, she's some kind of criminal. She's being treated like she's being arrested. I would agree with that. Under the . . . She's not being treated like, we're here just to help you and to try to make sure that you don't harm yourself, and are you safe? Do we need to call someone? It's not that kind of encounter. We see a lot of encounters of both kinds. I don't disagree with that. Under the community caretaker function, they basically put it into a Terry detention, and of course, there is a right under Terry to use a certain amount of force. Now, you can say that these police officers did not treat her in a loving manner, but she obviously was not treating them in a loving manner either. She didn't want to fool with him. She wanted to be left alone. She wanted to be left alone, and under the community caretaker function, they've got a duty to get her to medical care. She engages in the fight in the physical altercation, would keep it undisputed, in the physical altercation with Montez, and she wins. She comes out of it not under control, not handcuffed. It is at that point, 1231 of the elapsed time of Sutton's body cam video, that he releases the dog. The reason that he does that is there is nothing good served by a long physical fight with somebody in the woods. She's obviously got access to impact weapons. I dispute the fact that Officer Sutton knew that she was unarmed. In the rundown with him, which occurs at 26 seconds to 1 minute 50 seconds of the video, he is never informed that she is not armed, only that she had some type of weapon in which to inflict the wound from which she's bleeding. So he does not know that she is unarmed, but he does know that he does not want a long physical encounter with Montez and her. Montez goes down in the brambles, then we've got weapons retention issues. Time is almost up, and I'm just wondering, what do you say to all the circuit cases, many circuits, that talk about the duration, the duration of the bite? He wants the bite, Officer Sutton wants the bite to end in seven seconds. At 12.38, he's ordering the dog off. He then has four, at least four, it may be five, at least four more off release commands over the next 20 seconds. He then physically goes through the brambles and gets there. So this ends up being, I think the dog engages at 12.34, he has the dog off at 13.33. This is 59 seconds. And it wasn't intentional. He wanted Officer Sutton, and one other thing, she is still not subdued. Montez says at 13.38, give me your hands or you're going to get bit again. So I wish it was faster, and I think Sutton wishes it was faster. The dog did not cooperate. Is that normal? Does that happen a fair amount of time, that the dogs, because they're being trained to continue to bite, and then that they don't always stop? Your Honor, it does not. And so the way that this case developed, we did have to produce all of the dog encounters of Officer Sutton. And you don't have any record, you don't have any of those in the record in front of you which would have been put in, in response to the motion to dismiss, had there been any other encounters like this. There have not been. What was it, the blood? Was it the sweat? Was it the fight that the dog just saw? I don't know, but Officer Sutton did not intend for it to be 59 seconds. All right, thank you, Mr. Shelby. Mr. Flake. Good morning. May it please the Court. My name is Daniel Flake, and I represent Deputy Montes in Montgomery County, Texas. I wanted to address one issue before I start, which is Judge Elrod. On ROA 767, there's a copy of, I'm sorry, 776, there's a copy of what we call an emergency detention order. It was the order under the Mental Health and Safety Code of Texas in which Deputy Montes did detain Ms. Sly. And that order has a partially typed and partially written portions. The typed portions are essentially the law on when a deputy can, in Texas, can detain someone for these, for these types of illness. I plan to focus the Court's attention today on two matters. First is the application of the accident circumstances exception to the ADA and the Rehabilitation Act as they apply to active scenes. And the second is to the second prong of the, I'm sorry, bystander liability test. That's the first prong. Montgomery County relied pretty heavily on the video as seen. They believe that the all relevant portions of the video show that this was not a secure scene at any time. Specifically Ms. Sly was bleeding from a self-inflicted wound to her neck, which we do find out is from her carotid artery. She nicked her carotid artery. That she was not compliant with the officers at any time and that she actually did fight with Deputy Montez. Ms. Sly would have you disregard. Ms. Sly's danger to herself. I think it's pretty evident that if you're bleeding from the neck, and at this point she's been missing for about 50 minutes in the woods, that she was a danger of bleeding out if nothing else. And we do not believe that that is an appropriate application of Hines v. Richard in which the officers do not have to consider the application of the ADA prior to securing the safety of themselves and others. We believe she falls under the category of others as a human being. She did strike Montez at least once, is that right? We believe so. Montez in his report indicates he was hit in the eye and his eye and the video you see his eye was red. He also was subject to bloodborne pathogens. He had to undergo testing for any kind of blood diseases because he did get blood in his eye as well. And that's all in his report, I think around 770, 767. As to the second issue I wanted to talk about was the second element of the bystander liability. The judge did not reach, the district court did not reach this issue. He essentially resolved it on the first element, which was just the violation of constitutional law. We do not believe the plaintiff has stated any facts in the video supports that the same contention that Deputy Montez could have prevented this harm in any way even if we assume that it was a violation of constitutional law. We believe there's sufficient evidence in the record for the court to render for Montez on this if the court finds it necessary to reach this issue. So no reasonable person could say Montez should have grabbed the dog off of her? No. I don't believe so. Because, well, as Mr. Selby explained, this was a seven-second bite. And so at this point, and the dog did come in fairly fast, I'm not even clear that Montez could have, if he was obligated to, put his arm in the way and take the bite for her or something along those lines. No, but during the next 45 to 50 seconds, why couldn't he grab the dog and get it off of her? Montez is not a trained dog handler. And if the person who is trained to handle the dog is giving the dog commands and is trying to get the dog off, could not do it. Why isn't that person jumping in and taking the dog off? Which person? Your co-defendant. Sutton? I'm not that familiar with dog training itself. I know he was giving commands and that the dog was— But when the commands are not working and it's your dog— And he did— If you're a general person, you have to try to get your dog off of somebody or something. Why isn't that true for an officer whose—this is their special dog? Right. And as Mr. Selby said, he did come through the brambles at some point and start pulling the dog off physically. I think that the inclination of these kind of videos is to watch them. You know, I'm guilty of it when we do our eye investigations, just from the comfort of my office, drinking coffee, backing it up, looking at multiple views. But this is happening very fast and you have a person with you who is very violent. You don't know if she still has a razor on her. You don't know if she's about to bleed out. You don't know what your timing is like. So I think their first goal was to get her under control, to get her back to the ambulance. It then turned into a fight. And then when the dog was released, it became, get the dog off of her after they got her under control. But I don't think that they have alleged, and I can't see how, Deputy Montes could have done a better job than Officer Sutton did, considering Officer Sutton was trained in this. And additionally, their argument essentially is that the reasonable opportunity prong is satisfied by mere proximity to the dog. We don't believe that's a correct reading of the reasonable proximity prong. We believe there's, I'm sorry, the reasonable opportunity to prevent the harm. We believe we have to have some opportunity to actually stop the harm. In this case, as I said, there were, I think, three sections of the bite. First was the initial bite, second was the release, and third was the unintentional bites. There's no indication in the record that, or even no allegation that he could have stopped any of these three things from happening. And so we think- Are the dogs trained to re-bite and to bite whatever part of body is nearest to them? Are they trained to do that? I don't know if that's true, Judge. I did not, I have not had a dog bite case personally, so I have not researched the law and I have not had one with our entity where I would know our own policies. In this case, I would mention that the dog was used because the cell phone pinging did not work. If you read in Montes' report, again, around 767, they did try to ping her cell phone in attempt to locate her, but they weren't able to. So considering the heavy bleeding and the hiding in the woods, that's when the dog was used to track her. Right. To track her. Yes. But to bite her is different than some- It is. But this case, I think, changed dramatically whenever she assaulted Montes. I mean, at least the officer on the street, again, you have a person who obviously has no regard for her own life. There's no way to say she would have regard for the officer's lives. She cut her throat with something. We don't know if she still has it. It's very easy to hide a small razor or a piece of glass, whatever it is, it can cut. We don't know. So the officers treat her as if she can hurt them because she- What about the getting the dog off of her back to that part, though? They want to get the dog off of her at that point. I think seven seconds was the intentional bite. Yeah, and it goes on for 53 more seconds. Right. And which is a long time when you're being repeatedly bitten by a dog. And so I'm wondering, you said that he didn't have a duty to do anything at that point as the bystander person. I don't- To get his canine officer off of the person. Isn't that your- that's what you were saying? I don't think I just said he didn't have a duty at that point. I think we challenged specifically on the opportunity, the reason for opportunity, and there was just simply nothing- Why did he not use a taser or, God forbid, shoot Thor if necessary? Why aren't those opportunities? I did not find any law require him to contemplate, certainly not a firearm discharge in those close proximity to everybody else. He could easily hit someone else. What about the taser- The taser- On the dog, to get the dog, because they are not able to control the dog and the dog is continuing to bite the person, and you say they can't yank the dog off. Why can't they tase the dog? I think Montez was probably, just from the video, mostly preoccupied with controlling Ms. Sly still, still did not have her completely in control, did not want her to put- certainly didn't want her to put her hands in the dog's face. Officer Sutton? But I don't know much about dog bites, and I don't want to misspeak because I don't want to tell you something I don't know the actual answer to. They can be lethal. I'm sorry? They can be lethal. They can be lethal. Unfortunately, I do mental health cases, and I also do dog bite cases in Montgomery County, so we've seen what dogs can do to children. But they are a necessary tool for law enforcement, and frankly, without Thor, she may not have died that day. She was bleeding from a carotid artery cut. So they had to deploy the dog, and it's unfortunate it took the turn it did, but it took that turn because of her. I mean, if you look at the use-of-force continuum, they made the presence their first use-of-force. But they acted that way because of her. Thor gained control because of her? I thought it was just Thor went out of control, and we don't know why, and we'll never know why, but Thor went out of control. I believe the first bite was intentional. There was a— No, after the seven seconds, Thor is out of control. I thought your co-counsel acknowledged that. I think that's great. Thor would not release the bite on command. I don't know the protocol for dog handlers, how they get dogs off of people, but especially for Montez being non-trained, I think he would be reasonable to assume that the dog handler was the best person to get control of the dog at that point. All right. Anything else, Mr. Blake? No, Judge. Thank you. Thank you. Mr. Johnson for rebuttal. Thank you. Given this situation, what were these two officers, officer and deputy, what should they have done? They know that this particular unfortunate person is bleeding heavily, and we heard a description of the surroundings and the woods and whatever, so what is the proper thing for them to have done, if there's any kind of community care function, or maybe you disagree with that? So just tell us generally. Your Honor, I think what we can say with absolute certainty is that we assert that what they should not have done was release the dog after nine seconds of a half-hearted attempt to handcuff her. What they should have done— You heard my question. Yes. What should they have done? Yes. What they should have done, you know, so they get her cornered. She's against the fence. They mention that she was told to back up. I don't know where she was supposed to have backed up to. She was backed up against the fence. Then Montez comes at her to attempt to handcuff her, tries for nine seconds, immediately fails, disengages. At that point, you either reengage with open-hand control, take one step higher rather than several steps higher of force, revert to verbal negotiation, which had not truly occurred at that point. I mean, there was a lot of jawing back and forth, but there was never a discussion, as Judge Elrod noted, of, hey, we're here to help you. We're trying to get you to medical help. It was just shouting commands, dog barking, at a person who was already in mental crisis. They already knew that she was under quite a bit of distress, and added to that situation by hunting her with a find-and-bite dog. So I do want to address, as well, a couple of things that my colleagues mentioned. First, wrestling match in the woods, I wouldn't say is a fair description of the video. And even if somebody might argue that that is shown in the video, it's certainly not the only interpretation of the video. It's that there's— —that she punched him in the eye? Yes. Yes, she does. —a fact issue on whether she punched him in the eye or not? Absolutely. And what we can see in the video, and, you know, we've been litigating this case. It's been five years since the event, and we've been litigating this case for a number of years. I've watched the video a number of times, half-speed, frame-by-frame, full-speed, any way you like. All I have ever been able to discern from that video is Montez coming at her and her pushing him away. I don't see any close-fist swings. I don't see any punches. I don't see any swings toward the eye or any sort of instigation, certainly, as Officer Montez alleges. Is there a community care function? That's what we've been calling it today. If so, how extensive is it? What is that duty or responsibility? That's exactly what I was going to address next, Your Honor. So that's not something that was brought up in any significant capacity before this court, as Mr. Selby mentioned. He brought it up before the district court, and it was not a major factor in the dispute. It's certainly not a dispositive issue if this court finds that there was a community caretaker function that the officers were serving and that she was under some obligation to follow their orders. That doesn't change the fact that the speed of escalation and the low need for force relative to the amount used make it excessive force. So it's certainly not a dispositive issue, but if it's something where this court would like to gauge the depths of what that community caretaker function specifically entails and whether it allows for, as we're discussing, just shy of lethal force, then that's something we would certainly be willing to provide further briefing on. Do you admit that because she had nicked her carotid artery that she was in danger of bleeding out? Do the facts support that? At this stage, Your Honor, I don't think that the video itself or the facts alleged would indicate any danger that she was in imminent risk of bleeding out immediately. It wasn't something where we would need to, either us or my colleagues would need to get medical experts and see what the real risk was. Certainly she had wounded her carotid artery, but if the risk was bleeding out, again, it's never been explained here by my colleagues on the other side by the district court how causing further dog bites, which, by the way, she was hospitalized for the dog bites and had to return to the hospital for the dog bites, not for the wound to her neck. So with the- But the question is what an officer on arriving on the scene would have thought as to any, not necessarily certainty of fatality, but danger to her from some heavy bleeding from a part of the body that we would certainly, I think, all know as it would be a very, potentially very serious. Right, Your Honor. So with respect to what an officer sees and what an officer thinks, even to the extent that getting her to medical care requires a certain amount of exigency, which, again, in this case, I don't think from the video at the pleading stage we can say that with certainty at this point. But even given that being the case, I don't think that the appropriate response in that circumstance is causing further wounds, causing further bleeding. Your time has expired. Thank you, Mr. Johnson. Absolutely. Thank you, Your Honor.